NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 6, 2009[*]
Decided May 6, 2009

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

JOEL M. FLAUM, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 08-2627

| | |
|---|---|
| PATRICK J. FITZGERALD, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *Plaintiff-Appellant,* | |
| *v.* | |
| | No. 07-cv-061-bbc |
| JAMES GREER, et al., | |
| *Defendants-Appellees.* | Barbara B. Crabb, *Chief Judge.* |

**O R D E R**

Wisconsin inmate Patrick Fitzgerald filed suit under 42 U.S.C. § 1983 claiming as relevant here that three prison doctors were deliberately indifferent to his complaints of chronic pain. The district court granted summary judgment for the defendants, and we affirm.

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

We construe the facts in the light most favorable to Fitzgerald. *See Greeno v. Daley*, 414 F.3d 645, 648 (7th Cir. 2005). In October 2003 Fitzgerald was in a car accident that left him with a brain contusion, punctured lung, dislocated shoulder, shattered ankle, and fractures in his spine, humerus, and ribs. He remained hospitalized until March 2004 and afterward was referred to a pain specialist who diagnosed him with chronic pain syndrome and prescribed opioids for pain management. Fitzgerald was later convicted on an unrelated drunk-driving charge, his ninth conviction for that offense. He was also convicted of marijuana possession and bail jumping. At his sentencing in March 2005, Fitzgerald, through counsel, represented to the court that he was HIV-positive and taking an expensive "cocktail" of drugs, but medical records confirm that Fitzgerald had previously told his pain specialist that he was *not* HIV-positive. Fitzgerald entered Dodge Correctional Facility in April 2005 to begin a four-year prison sentence.

At intake Fitzgerald was examined by Dr. Timothy Correll. The prison had not yet received any medical records from outside sources, but Fitzgerald reported that he was taking Naprosyn, a nonsteroidal anti-inflammatory, for chronic pain in his arms, legs, and shoulders but getting little relief. He also reported, according to Dr. Correll, that he had been HIV-positive since 1993, but Fitzgerald insists that he simply told the doctor that he once received a false-positive result on an HIV test. In any event, Dr. Correll placed Fitzgerald on the prison's chronic-disease list and ordered that he be scheduled to visit an immunology clinic and receive a bottom-bunk restriction, multivitamins, double meal portions, and monthly nurse visits—all standard orders for HIV-positive inmates. Dr. Correll also authorized Fitzgerald to wear sneakers instead of standard-issue work boots and prescribed Amitriptyline, which Dr. Correll describes as an anti-depressant used in low doses to manage pain, including pain associated with HIV-related peripheral neuropathy.

Dr. Correll had also ordered an HIV test, and when the result came back negative a few days later, he rescinded his earlier orders, including the Amitriptyline prescription and sneaker accommodation. Dr. Correll insists that he did so because all of his orders had been responsive to Fitzgerald's purported HIV status. Fitzgerald counters that Dr. Correll's motive was retaliatory; the two men argued, he says, about whether Fitzgerald had misrepresented his HIV status, and Dr. Correll had ended the discussion by saying, "I could care less about your chronic pain." Fitzgerald received no medication for eight weeks until June 17, when he was prescribed Ibuprofen, a nonsteroidal anti-inflammatory. Three days later, Fitzgerald was transferred to Kettle Moraine Correctional Institution, where a prison doctor prescribed Tylenol, Vicodin, and Ketoprofen, another nonsteroidal anti-inflammatory, for his pain.

In November 2005 Fitzgerald was transferred again, to Oshkosh Correctional Institution, where he immediately complained of chronic pain in his back, left shoulder, and neck and asked for medical attention. About a month later, in early January 2006, Fitzgerald met with Dr. Roman Kaplan and requested medication stronger than Vicodin because, he said, it had become ineffective. Dr. Kaplan instead gradually decreased the Vicodin and then discontinued it, substituting a prescription for Ibuprofen. Fitzgerald insists that he told Dr. Kaplan that Ibuprofen was inappropriate because he suffers from stomach ulcers and that Dr. Kaplan said he did not care. Dr. Kaplan, of course, denies this statement. He also denies knowing about Fitzgerald having ulcers, and at summary judgment Fitzgerald produced no medical evidence to corroborate his assertion that he does. Dr. Kaplan insists that he switched the prescription since Fitzgerald exhibited a normal gait and full range of motion and there were no objective findings to support his self-reported pain. The doctor also insists that Vicodin was inappropriate for Fitzgerald, whom he suspected was drug dependent, because it is best reserved for short-term pain treatment and has a high risk of abuse. The proper course of treatment, in Dr. Kaplan's opinion, was a moderate dose of a nonsteroidal drug coupled with a lower bunk and an extra mattress and pillow. Over the following week, Fitzgerald filed Health Service requests almost daily, complaining that he was in chronic pain and that the Ibuprofen was causing intestinal bleeding. He asked to see a doctor other than Kaplan, but Kaplan was the only physician on staff at that time.

The following month Fitzgerald saw a nurse for an unrelated condition and reported that he had blood in his stool and was suffering from abdominal pain. The parties dispute whether Fitzgerald ever provided the stool sample requested by the nurse, and it is unclear what tests, if any, were performed at that time. But in April he was seen by Dr. Deb Lemke, who replaced Dr. Kaplan. Fitzgerald complained of diarrhea, and Dr. Lemke prescribed medication for gastroesophageal reflux disease and ordered stool tests, which came back negative for occult blood. Although denied by Fitzgerald, Dr. Lemke also insists that he reported having HIV, for which he was treated at a Milwaukee hospital. At summary judgment Fitzgerald did not dispute that he signed a release giving Dr. Lemke permission to obtain his hospital records, or that the records identify him as being HIV-positive since 1992 and on an "HIV cocktail" until April 2005 when he entered the Department of Corrections. Fitzgerald insists that during this visit he also complained about chronic pain, but Dr. Lemke denies this and her treatment notes support her version of events.

Fitzgerald saw Dr. Lemke again in early September when, they both agree, he reported chronic pain. In her treatment notes for this appointment, Dr. Lemke noted that Fitzgerald had misrepresented his HIV status and the recency of his car accident to department medical staff, and that his medical records reflected a history of drug and alcohol abuse. She declined to place Fitzgerald on any additional medication because, in

addition to her concern about those issues, she had not observed any physical signs that Fitzgerald was in pain, the treating physician before her had not prescribed narcotic pain medication, and Fitzgerald had recently requested that his medical classification be changed to "any activity," a fact that Fitzgerald does not dispute.

Fitzgerald filed this action pro se in February 2007, and the district court appointed counsel. His amended complaint, filed by counsel, named as defendants Drs. Correll, Kaplan, and Lemke, along with several other defendants who are mentioned only in passing or not at all in Fitzgerald's appellate brief. After filing suit Fitzgerald was transferred twice more to other prisons, where doctors prescribed physical therapy and Gabapentin, an anticonvulsant used in treating neuropathic pain. He was also referred eventually to Dr. Sara Holz, a chronic-pain specialist, who, based on a single physical examination and a review of Fitzgerald's medical records, agreed that Gabapentin was appropriate but recommended increasing the dose. She also recommended "considering" methadone, an opioid. Dr. Holz later testified, however, that Fitzgerald's treating physician was better situated to assess whether Fitzgerald was actually suffering from the levels of pain he reported. Dr. Marco Araujo, a pain-management specialist retained by Fitzgerald during the litigation, opined that Ibuprofen would be ineffective for long-term use because it would not adequately treat Fitzgerald's pain. In Dr. Araujo's view, giving Fitzgerald methadone and steroid injections along with the physical therapy and Gabapentin would be the best course of treatment.

At a hearing on Fitzgerald's request for a preliminary injunction, both pain specialists watched footage that prison guards had surreptitiously captured of Fitzgerald packing his belongings while preparing to be transferred. The video shows him over an extended period laughing, lifting objects, leaning under a guardrail, and bending at the waist up to 90 degrees with no apparent difficulty. Dr. Holz testified that, after seeing the video, she would "possibly change" her methadone recommendation because Fitzgerald demonstrated a greater range of motion and an ability to sustain a flexed posture longer than he had during her examination. Dr. Araujo, however, testified that the video had no effect on his recommendation. The district court also heard testimony from two prison doctors who had treated Fitzgerald after he filed suit, and both opined, based on their own surreptitious observations, that he was malingering and embellishing his pain.

The district court issued a comprehensive decision denying Fitzgerald's request for a preliminary injunction and granting summary judgment for all defendants. The court concluded that Fitzgerald, who has since been released from prison, produced insufficient evidence for a jury to find that any defendant had been deliberately indifferent to his complaints of pain. We focus here on Drs. Correll, Kaplan, and Lemke, the only defendants given significant mention in Fitzgerald's brief. We review the court's decision de novo,

construing all inferences in Fitzgerald's favor.  *See Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).

To survive summary judgment on his claim of deliberate indifference, Fitzgerald needed to produce enough evidence for a reasonable jury to conclude that at least one of the doctors knew about but consciously disregarded a serious medical condition.  *See Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).  The Eighth Amendment does not require prison doctors to treat inmates in the exact manner they demand, *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), but a prisoner can establish deliberate indifference by proving that doctors let him suffer pain needlessly when they could "readily and inexpensively" have alleviated it, *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).

We conclude, first, that Fitzgerald failed to present sufficient evidence to survive summary judgment on his claim against Dr. Correll.  We accept, as we must, Fitzgerald's version of events, which is that Dr. Correll became angry when he learned that Fitzgerald did not have HIV and, when the two men argued, told Fitzgerald that he did not care about his pain.  But that is where Fitzgerald's evidence ends, and a jury could not reasonably infer from it that Dr. Correll then cancelled the Amitriptyline prescription and rescinded Fitzgerald's authority to wear sneakers in order to retaliate for Fitzgerald's apparent misrepresentation of his HIV status.  Dr. Correll testified at his deposition that both the prescription and the sneaker accommodation were responsive to his belief that Fitzgerald had HIV, and there is no evidence that the doctor was aware that cancelling either would cause Fitzgerald to experience increased pain.  Indeed, Dr. Correll testified that if he thought Fitzgerald had ankle pain, he would not have prescribed sneakers because they provide less support than the standard work boots.  Moreover, Dr. Correll had observed no objective indications to support Fitzgerald's subjective reports of pain and had yet to receive Fitzgerald's pre-incarceration medical records.  Finally, Fitzgerald presented no evidence that, after the two men argued, Dr. Correll was ever aware that Fitzgerald was in pain.  In fact, Fitzgerald presented no evidence of *any* contact whatsoever with Dr. Correll following their alleged argument.  No jury could conclude on this evidence alone that Dr. Correll's behavior rose to the level of a constitutional violation.

Next, we also agree with the district court that Fitzgerald failed to present evidence that Drs. Kaplan and Lemke were deliberately indifferent to his pain by failing to prescribe something stronger than Ibuprofen.  Relying on the opinions of Dr. Araujo and Dr. Holz that methadone might be useful in treating Fitzgerald, he asserts that prescribing Ibuprofen was such a substantial departure from accepted professional judgment as to raise an inference of deliberate indifference.  *See Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).  But rarely will a disagreement with a doctor's course of treatment give rise to a constitutional

claim, *Johnson*, 433 F.3d at 1013, especially in a situation like this one. This is not a case of prison officials withholding pain medication as a "gratuitous cruelty." *See Ralston*, 167 F.3d at 1162; *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002); *Murphy v. Walker*, 51 F.3d 714, 720 (7th Cir. 1995). Rather, Drs. Kaplan and Lemke concluded after multiple physical examinations that Fitzgerald did not warrant anything stronger than Ibuprofen because he did not demonstrate any objective indications of pain, he had a history of substance abuse and of misrepresenting his HIV status, and he recently had asked that his work classification be changed to "any activity," indicating that he was exaggerating the extent of his pain. Indeed, two other prison doctors who later treated Fitzgerald independently concluded that he was embellishing his symptoms. And although Dr. Holz later suggested that she would "consider" methadone, she also agreed that Fitzgerald's treating physician would be in a better position to assess the credibility of his complaints. We must give deference to a doctor's treatment decisions unless "no minimally competent professional would have so responded under those circumstances." *Sain*, 512 F.3d at 894-95. The evidence here establishes that Drs. Kaplan and Lemke decided to treat Fitzgerald with Ibuprofen based on their professional assessment of his medical history and the lack of objective indications of pain, and we will not second-guess their decisions. *See Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (explaining that constitutional claim cannot be established simply by offering evidence that another medical professional would have chosen a different course of treatment).

What might have been a closer question is whether Drs. Kaplan and Lemke should have been treating Fitzgerald with Ibuprofen, a drug that can aggravate gastrointestinal problems, if he was suffering from stomach ulcers. Fitzgerald, though, simply presented evidence that he complained about stomach ulcers to each doctor on at least one occasion, but he produced no medical evidence to corroborate what appears to be a self-diagnosis. Fitzgerald's medical expert, Dr. Araujo, conducted an exhaustive review of his medical records and afterward never mentioned stomach problems. Dr. Araujo instead said that Ibuprofen was inappropriate for long-term use because it would not adequately treat Fitzgerald's pain. Further, Dr. Lemke tested Fitzgerald's stool for occult blood with negative results. Although Fitzgerald complained of bleeding and pain associated with Ibuprofen, objective medical results undermined his complaints, and we therefore cannot conclude that the doctors deliberately ignored a serious risk of harm.

Finally, Fitzgerald challenges the district court's decision to consider the prison's video footage when ruling on the defendants' motion for summary judgment. The district court was entitled to consider any admissible evidence offered in support of the motion, *see Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002), and we review decisions on admissibility only for abuse of discretion, *see Estate of Moreland v. Dieter*, 395 F.3d 747, 753 (7th Cir. 2005). Although Fitzgerald now describes the footage as "heavily

edited and fraudulently altered," his only objection in the district court was that the video appeared to play back at a speed faster than real time and was therefore misleading; that objection is thus the only one preserved on appeal. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006). A viewing of the video indicates that it appears to play back at a slightly accelerated speed, but we disagree that this undermines its relevance. *See* FED. R. EVID. 402. Dr. Holz testified that she could not tell whether the video played in real time but that it nevertheless might affect her assessment of Fitzgerald because he exhibited a greater range of motion and ability to maintain a flexed posture in the footage than he had in her office. Regardless of the video's speed, then, it is relevant to Fitzgerald's range of motion, and we therefore conclude that the district court's decision to admit the video was not an abuse of discretion.

AFFIRMED.